**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VANDA PHARMACEUTICALS INC.,<br>2200 Pennsylvania Avenue NW, Suite 300E,<br>Washington, DC 20037,<br><br>         Plaintiff,<br><br>v.<br><br>FOOD AND DRUG ADMINISTRATION<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993;<br><br>ROBERT M. CALIFF, M.D., in his official<br>capacity as Commissioner of Food and Drugs<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993;<br><br>UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES<br>200 Independence Avenue SW<br>Washington, DC 20201;<br><br>and<br><br>XAVIER BECERRA, in his official capacity as<br>Secretary of Health and Human Services<br>200 Independence Avenue SW<br>Washington, DC 20201,<br><br>        Defendants. | Civil Action No. 1:23-cv-280 |

**COMPLAINT**

Plaintiff Vanda Pharmaceuticals Inc. (Vanda) brings this complaint against Defendants the

U.S. Food and Drug Administration (FDA), the Commissioner of Food and Drugs, the U.S.

Department of Health and Human Services, and the Secretary of Health and Human Services, and

alleges as follows:

1

**NATURE OF THE ACTION**

1.      Vanda is a small pharmaceutical company that developed the first FDA-approved therapy—HETLIOZ® (tasimelteon)—to treat Non-24-Hour Sleep-Wake Disorder (Non-24), a serious chronic disorder in which the body cannot synchronize its internal circadian rhythmicity with the 24-hour day.

2.      Non-24 is a rare disorder that commonly affects individuals who are visually impaired, with estimates suggesting that it affects *half* of individuals who are totally blind. After speaking with many blind individuals who described the difficulty they have identifying and safely using prescription medications, Vanda decided to include Braille lettering on its label and worked iteratively with FDA at length to reach approval to market HETLIOZ® with Braille on its label— the first FDA-approved label to do so. As approved, HETLIOZ® labels also display instructions stating "Dispense in original container" and "Do not cover Braille."

3.      In December 2022, FDA granted final approval to an abbreviated new drug application (ANDA) sponsored by Teva Pharmaceuticals, USA, Inc. (Teva) to market generic tasimelteon. But—despite the statutory and regulatory requirements that an ANDA holder propose the same labeling and same conditions of use as the listed drug of which it is a generic—Teva did *not* include Braille lettering on its label or impose the same dispensing conditions as HETLIOZ®. On information and belief, by omitting any mention or explanation of these differences in its ANDA, Teva also violated prohibitions against making materially untrue statements.

4.      Because tasimelteon is indicated to treat a disorder that occurs with substantial prevalence in the blind population, FDA's approval of Teva's ANDA despite Teva's failure to include Braille lettering on its label risks substantial public-health harms. Patients will no longer be able to identify their tasimelteon using Braille if they are given Teva's generic tasimelteon instead of Vanda's HETLIOZ®.

5.     FDA unlawfully approved Teva's ANDA despite the statutory and regulatory requirements that the ANDA holder's proposed labeling be the same as the listed drug's, that the ANDA holder's proposed conditions of use be the same as the listed drug's, and that the application be free of untrue statements of material fact.

6.     Thus, this is an action under the Administrative Procedure Act to vacate the FDA's unlawful approval of Teva's ANDA.

## PARTIES

7.     Plaintiff Vanda is a pharmaceutical company focused on the development and commercialization of innovative therapies to address high-priority unmet medical needs and to improve the lives of patients. Vanda is incorporated in Delaware and its principal place of business is 2200 Pennsylvania Ave, NW, Suite 300E, Washington, DC, 20037.

8.     Defendant FDA is an agency of the United States government within the Department of Health and Human Services and is responsible for administering the relevant provisions of the FDCA. FDA is headquartered in Silver Spring, Maryland.

9.     Defendant Robert M. Califf is sued in his official capacity only as the Commissioner of Food and Drugs. The Commissioner of Food and Drugs has delegated authority to administer the FDCA and oversees the operations of the FDA.

10.     Defendant HHS is a cabinet-level executive department charged with enhancing the health and well-being of all Americans. HHS is headquartered in Washington, D.C.

11.     Defendant Xavier Becerra is sued in his official capacity only as Secretary of Health and Human Services. The Secretary of Health and Human Services is the official charged by law with administering the FDCA.

**JURISDICTION AND VENUE**

12.     Vanda brings suit against the defendants pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.* The relief requested against the defendants is authorized by the APA (*see* 5 U.S.C. §§ 701-706), and the Declaratory Judgment Act (*see* 28 U.S.C. §§ 2201-2202).

13.     Because Vanda's claims against the defendants arise under the APA and the FDCA, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

14.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Vanda resides in this district (*see* 28 U.S.C. § 1391(c)(2)), and no real property is involved in this action.

**BACKGROUND**

A.     **HETLIOZ® (tasimelteon)**

15.     Vanda is a small pharmaceutical company whose business model largely consists of acquiring compounds that other companies failed to develop into a useful treatment, identifying potential medical uses for them, devoting substantial resources to developing them, and, if successful, seeking FDA approval and commercializing them.

16.     Through this model, Vanda develops and markets innovative pharmaceutical products to address high-impact unmet patient needs. One of its drugs is HETLIOZ® (tasimelteon), a circadian-rhythm regulator.

17.     Vanda acquired tasimelteon, now marketed as HETLIOZ®, from a large pharmaceutical company that tried, but failed, to develop it into a useful FDA-approvable therapy.

18.     HETLIOZ® is among a class of drugs known as melatonin receptor agonists, which bind to and activate receptors in the brain for melatonin, a hormone that regulates the sleep cycle.

19.     Under Vanda's stewardship, and after devoting years and many millions of dollars to research, development, and regulatory processes, HETLIOZ® became the first FDA-approved

4

therapy to treat two rare and orphan disorders: Non-24-Hour-Sleep-Wake Disorder (Non-24) and later nighttime sleep disturbances in Smith-Magenis Syndrome in patients 16 years or older.

20.     Specifically, Vanda is the owner and sponsor of new drug application (NDA) 205677 for HETLIOZ® (tasimelteon), which was approved by FDA on January 31, 2014, for the treatment of Non-24. *See* Exhibit 1, Hetlioz Non-24 Approval Package.

21.      Non-24 is a serious chronic disorder in which the body cannot synchronize its internal circadian rhythmicity—the process that regulates the sleep-wake cycle—with the 24-hour day. *See* Exhibit 2, Sabra M. Abbott, *Non-24-Hour Sleep-Wake Rhythm Disorder*, 37 Neurol. Clin. 545, 545 (2019); Exhibit 3, Nat'l Org. for Rare Disorders (NORD), Non-24-Hour Sleep-Wake Disorder (2017), perma.cc/8SS8-M6EX.

22.     Most people have a natural circadian rhythm that oscillates with an intrinsic period that is longer than 24 hours, but their bodies can reset that rhythm in response to daily environmental cues, like morning light (a process known as entrainment), and thereby maintain relatively consistent sleep/wake times. *See* Exhibit 3, NORD, *supra*. Individuals with Non-24, however, lack this ability.

23.     In the classic expression of this disorder, the longer-than-24-hour circadian cycle progressively delays the sleep-wake cycle by minutes or hours each day, such that individuals with Non-24 will sleep and wake at a later time each day than the day before. Exhibit 3, NORD, *supra*. The individual's cycles of body temperature and hormone rhythms also follow a non-24-hour rhythm. *Id.* Eventually, the individual comes "all the way around the clock" and is temporarily aligned with the 24-hour day, until the cycle starts once again. *Id.* During the intervals in which the individual's body is misaligned from the day-night cycle, individuals with Non-24 experience insomnia and excessive daytime sleepiness. Exhibit 2, Abbott, *supra*, at 546; Exhibit 3, NORD,

*supra*. The symptoms of chronic sleep deprivation also accumulate, resulting in fatigue, depression, difficulty concentrating, and memory problems. Exhibit 3, NORD, *supra*.

24.     The FDA itself has recognized that "Non-24 can be debilitating for many patients." Exhibit 4, U.S. Food & Drug Admin., Letter to Drs. Bardehenn, Almashat, and Wolfe Re: Docket No. FDA-2015-P-2142 (Jan. 27, 2020), perma.cc/M4K9-VQ24 (FDA Non-24 Letter); *see also* NORD, *supra* (Non-24 "can be severely disabling"). Non-24 is often associated with psychiatric disorders, including depression and bipolar disorder. *See* Exhibit 5, Tatsuro Hayakawa et al., *Clinical Analyses of Sighted Patients with Non-24-Hour Sleep-Wake Syndrome: A Study of 57 Consecutively Diagnosed Cases*, 28 SLEEP 945, 951 (2005), perma.cc/873M-RRBD; Exhibit 2, Abbott, *supra*, at 546.

25.     Over time, the symptoms of chronic sleep deprivation—including daytime sleepiness, fatigue, depression, difficulty concentrating, and memory problems—accumulate and cause "extreme difficulty for the individual attempting to maintain social and career obligations." NORD, *supra*; *see also* Exhibit 4, FDA Non-24 Letter at 2-3; Exhibit 6, Roneil G. Malkani et al., *Diagnostic and Treatment Challenges of Sighted Non-24-Hour Sleep-Wake Disorder*, 14 J. Clin. Sleep Med. 603, 608 (2018), perma.cc/5VKX-XXQ5.

26.     Because of the nature of the disorder, Non-24 is frequently experienced by the visually impaired.

27.     As FDA has explained, that is because "[b]lind patients, on average, have an internal circadian rhythm that is 24.5 hours. For these patients, by Day 24, a complete inversion of the sleep-wake pattern can result, whereby the patient's sleep onset has been delayed into morning hours. In such cases, alignment with the 24-hour clock occurs once every 48 days." Exhibit 4, FDA Non-24 Letter at 2-3.

28.     As FDA has observed, "Non-24 is most prevalent in patients who are totally blind. It is estimated that *over half of totally blind individuals suffer from Non-24* and that approximately 100,000 people in the United States have the disorder." Exhibit 4, FDA Non-24 Letter at 2-3 (emphasis added).

29.     HETLIOZ® was the first FDA-approved treatment for Non-24. Today, tasimelteon remains the only FDA-approved medication for Non-24.

**B.     Braille labeling for HETLIOZ®**

30.     Because of the prevalence of Non-24 in patients who are visually impaired, Vanda originally proposed in its NDA to present the proprietary name and strength in Braille on the container label.

31.     Vanda arrived at this decision after speaking with many blind individuals who described the difficulty they have identifying and safely using prescription medications.

32.     For Vanda, including Braille on the label of a drug treating a condition affecting many blind people was a natural and necessary step to meet patient need and prevent medication errors. Vanda's decision was also groundbreaking.

33.     Following Vanda's affirmative efforts, HETLIOZ® became the first pharmaceutical product in the United States ever to include a Braille label specifically approved by the FDA. *See* Exhibit 7, Excerpts from Association for Education and Rehabilitation of the Blind and Visually Impaired, *AER Report* 12 (2014), perma.cc/WX9Q-QGKL.

34.     Though a voluntary step on Vanda's initiative, the Braille lettering on the Hetlioz® label came to fruition following a period of active engagement and collaboration between FDA and Vanda prior to the drug's approval.

35.     FDA thoroughly reviewed Vanda's proposed Braille labeling. Among other things, FDA demanded "actual physical samples of the 30-count bottle … with Braille over the English

text as [Vanda] intend[ed] to market [the drug]." Exhibit 8, Email from FDA to Vanda (July 8, 2013 2:24 PM). The agency also raised concerns about the accuracy of the Braille translation (*see id.*), ultimately demanding a certified translation. Exhibit 9, Email from FDA to Vanda (Dec. 27, 2013 10:51 AM).

36.     FDA staff in the Division of Neurology Products recognized the importance of Braille labeling and demanded that Vanda justify its decision not to include ***more*** information in Braille:

> Provide your rationale for only presenting the proprietary name and strength in braille on the container label. Clarify whether you considered if other important information, such as the established name or usual dosage, should also appear in braille on the container label to promote the safe use of the product. In addition, how did you determine the container label is the only place where braille is appropriate to ensure proper use of the medication by patients?

Exhibit 10, Letter from FDA to Vanda 4 (July 29, 2013).

37.     At the same time, FDA staff in the Division of Medication Error Prevention and Analysis (DMEPA) demanded that Vanda conduct a "label comprehension study" to "evaluate that the intended patient population can understand the information in braille presented on the label." *Id.* at 2.

38.     Vanda responded to both requests in August 2013. *See* Exhibit 11, NDA 205677, Sequence 0007, Response to Filing Communication. Vanda explained that its approach was consistent with guidelines developed by the United States Access Board and the European Commission. *Id.* § 2.2. Vanda further explained that it intended to market HETLIOZ® as a "container of use"; that is, it intended to distribute HETLIOZ® in a prepackaged bottle containing 30 capsules that was ready to be dispensed to the patient, thereby eliminating the need for pharmacists to transfer the drug to other packaging. *Id.* This approach allowed Vanda to affix "a standard label overlaid with a transparent label which includes the product name and strength in

braille" (*id.* § 1.2), while still allowing "sufficient space for a pharmacy label of 3.5 inches in length to be applied to the bottle by the specialty pharmacy or hospital without overlapping the braille text" (*id.* § 2.2). Further, Vanda explained that there was no need to present additional information in Braille on the bottle label because Vanda would also be providing a Medication Guide in Braille and audio formats. *Id.*

39.     Vanda also submitted a proposed protocol for a Braille Label Comprehension Study. *See id.* at App'x A.

40.     FDA thereafter assessed Vanda's proposal "for areas of vulnerability that could lead to medication errors." Exhibit 12, FDA, Label, Labeling, and Packaging Review, 1 (Sept. 26, 2013). FDA staff agreed that "a unit-of-use bottle" with a label that "contains Braille for the product name and strength … may be helpful to the patient." *Id.* However, FDA recommended that Vanda revise its proposed labeling to display instructions to pharmacists to "Dispense in original container" and stating, "Do not cover the Braille." *Id.*; *see* Exhibit 13, Email from FDA to Vanda (Oct. 2, 2013 9:20:00 AM) (directing Vanda to add such instructions to the label). FDA did not accept Vanda's first attempt to comply with those instructions and subsequently demanded that Vanda present the dispensing instructions in "bold font" for "increased prominence." Exhibit 14, Email from FDA to Vanda (Nov. 13, 2013 1:34:00 PM).

41.     At a mid-cycle meeting, FDA staff raised concerns about the protocol for the Braille Label Comprehension Study, including concerns about the number of patients to be enrolled, a specification that all participants should be able to read Braille, and the phrasing of the questions.

42.     In response to the agency's concerns, Vanda rewrote the questions, increased the study size, and included equal numbers of participants who could, and could not, read Braille. As shared with FDA in December 2013, the results of the study were:

- 100% of Braille readers identified at least 5 out of the 7 letters in Hetlioz;

- 17 of 22 Braille readers correctly interpreted the second line as '20 mg';

- 100% of non-Braille readers identified a difference between the two bottles and correctly identified the bottle with the Braille label.

Exhibit 15, NDA 205677, Sequence 0031, Response to DMEPA Information Request.

43.    The study also included open ended questions that asked participants for feedback about how to improve the bottle label. Based on that feedback, and to increase the quality of the Braille lettering, Vanda decided to switch to a higher quality printing method and submitted a new, revised labeling proposal. *Id.* FDA staff concluded that the revised labeling proposal was "reasonable" and that the results of the study were "acceptable." Exhibit 16, FDA, Label and Braille Label Comprehension Study Review, 3 (Dec. 31, 2013).

44.    When HETLIOZ® was approved, a senior FDA official involved in that decision noted that Braille labeling was a "unique feature" of HETLIOZ®. *See* Exhibit 17, FDA, Division Director Summary Review for NDA 205677, section 12 (Jan. 23, 2014).

45.    As approved by FDA, the bottle label for HETLIOZ® appears as follows:



*See* Exhibit 18, Hetlioz Label.

46.     As shown above, and as approved by FDA, the bottle label for HETLIOZ® includes the bold font instruction "Dispense in original container" and "Do not cover Braille." The label also includes the product name and strength in Braille. *Id.*

47.     Vanda also supplies its patients with audio books containing important prescribing safety information, and it includes on its website audio links to its prescribing information and a quick start guide about the drug. *See* Exhibit 19, *US Prescribing Information*, Hetlioz®, perma.cc/KBD6-Y3JZ (last visited Jan. 30, 2023).

**C.     FDA's unlawful approval of generic tasimelteon**

*1.     Same labeling requirement*

48.     Tasimelteon is a "new drug" under the FDCA. *See* 21 U.S.C. § 321(p)(1).

49.     With few exceptions, none of which are relevant here, no "new drug" may be introduced or delivered for introduction into interstate commerce in the United States without prior approval from FDA. 21 U.S.C. §§ 331(d), 355(a).

50.     There are multiple approval pathways for "new drugs."

51.     To obtain approval for an innovative drug product like HETLIOZ®, a manufacturer must submit a new drug application or NDA. 21 U.S.C. § 355(b)(1). An NDA is an extensive filing. *See* 21 U.S.C. § 355(b)(1)(A)-(G) (setting forth the filing requirements for an NDA); 21 C.F.R. § 314.50 (same). Among many other things, a full NDA must include adequate studies to show that the drug will be safe, and "substantial evidence" that the drug will be effective, under the conditions of use prescribed, recommended, or suggested in its labeling. "Substantial evidence" means one or more adequate and well-controlled clinical trials conducted by qualified experts. 21 U.S.C. § 355(d)(1); *see* 21 C.F.R. § 314.126.

52.     Studies have shown that preparing a successful NDA can take more than 12 years and can cost billions of dollars. *See, e.g.*, Gail A. Van Norman, *Drugs, Devices, and the FDA*, 1 JACC: Basic to Translational Science 170, 171 (2016) ("drug development takes on average 12 years from concept to market"); Joseph A. DiMasi et al., *Innovation in the pharmaceutical industry: New estimates of R&D costs*, 47 J. Health Econ. 20 (2016) (describing "total pre-approval cost estimate of $2558 million (2013 dollars)"). Indeed, FDA described the development program necessary to show HETLIOZ® to be safe as follows: "Safety data from 22 clinical studies were used to assess the safety of the drug product. The 22 studies include 14 Phase I studies, 2 Phase II studies and 6 Phase III studies. A total of 1,346 subjects received at least one dose of tasimelteon during the course of all 22 clinical studies." Exhibit 4, FDA Non-24 Letter at 13-14.

53.     At the other end of the spectrum, the manufacturer of a "generic" drug may seek approval through an abbreviated new drug application or ANDA. 21 U.S.C. § 355(j). ANDAs do not attempt to prove that the proposed generic drug is safe or effective for its intended use.

54.     Instead, to obtain marketing approval, an ANDA applicant need only show that a proposed generic drug is "the same" as a reference listed drug. *See* 21 U.S.C. § 355(j)(2)(A)(i)-(v), 355(j)(4)(B)-(G); 21 C.F.R. §§ 314.94, 314.127. If this showing of "sameness" has been made, FDA allows the generic drug to be marketed based on the agency's prior determination that the listed drug is safe and effective.

55.     Because the FDCA permits generic drugs to "piggyback[] on the original manufacturer's evidence of safety and efficacy" (*Teva Pharms., USA, Inc. v. Leavitt*, 548 F.3d 103, 104 (D.C. Cir. 2008)), the time and expense of pursuing generic drug approval is several orders of magnitude less than developing an innovative new drug and preparing a full NDA. Pfizer, *Let's See How Biosimilars Are Developed* (as of Jan. 22, 2023), perma.cc/7X6D-V28Z ("A generic

version of a small- molecule drug, on the other hand, costs $1 million to $2 million and takes approximately 2 years to develop.").

56.     One of the most important aspects of the "sameness" requirement is that the generic drug must have the same labeling as the listed drug. 21 U.S.C. § 355(j)(2)(A)(iv); *Novartis Pharms. Corp. v. Leavitt*, 435 F.3d 344, 346 (D.C. Cir. 2006) (noting the "requirement that a generic have the *same labeling* as the pioneer drug" (emphasis added)); *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613 (2011) ("A brand-name manufacturer seeking new drug approval is responsible for the accuracy and adequacy of its label," while "[a] manufacturer seeking generic drug approval, on the other hand, is responsible for ensuring that its warning label is the same as the brand name's.").

57.     The same labeling requirement stems from the FDCA's purpose "which is to assure the marketing of generic drugs that are as safe and effective as their brand-name counterparts." *Abbreviated New Drug Application Regulations*, 54 Fed. Reg. 28,872-01, 28,879 (July 10, 1989).

58.     Per the statute, every ANDA must contain "information to show that the labeling proposed for the [generic] is *the same as* the labeling approved for the listed drug." 21 U.S.C. § 355(j)(2)(A)(v) (emphasis added).

59.     FDA regulations further require that an ANDA include "[a] copy of the currently approved labeling … for the listed drug" (21 C.F.R. § 314.94(a)(8)(i)); a copy of "all labeling" for the proposed generic drug product (*id.* § 314.94(a)(8)(ii)); a "side-by-side comparison of the applicant's proposed labeling … with the approved labeling for the reference listed drug with all differences annotated and explained" (*id.* § 314.94(a)(8)(iv)); and a written statement from the applicant attesting that there are no labeling differences other than the ones annotated and

explained in the comparison (*id.* § 314.94(a)(8)(iii)). FDA cannot even receive an ANDA that lacks this information. *See* 21 C.F.R. § 314.101(d)(2)-(3).

60.     At the approval stage, the statute dictates that FDA must reject the ANDA if the "information submitted in the application is insufficient to show that the labeling proposed for the [generic] is *the same as* the labeling approved for the listed drug." 21 U.S.C. § 355(j)(4)(G) (emphasis added). FDA's regulations provide the same. 21 C.F.R. § 314.127(a)(7).

61.     The statute contains only two exceptions to the "same labeling" requirement, neither of which is relevant here. First, the statute provides that an applicant can obtain advance approval from FDA to depart from the listed drug's "active ingredient[,] … route of administration, dosage form, or strength" by filing a so-called "suitability petition." 21 U.S.C. § 355(j)(2)(C). If FDA has approved such a suitability petition, then the approved changes may be reflected in the labeling for the generic. *See id.* §§ 355(j)(2)(A)(v), (j)(4)(G).

62.     Second, a generic manufacturer is permitted to make changes that are necessary "because the [generic] drug and the listed drug are produced or distributed by different manufacturers." 21 U.S.C.§ 355(j)(2)(A)(v), (j)(4)(G). In other words, the statute allows generic manufacturers to use their own names, addresses, trade dress, and the like.

63.     FDA has created a third exception by regulation, allowing the labeling for a generic drug to omit "an indication or other aspect of labeling protected by patent or accorded exclusivity" (21 C.F.R. § 314.94(a)(8)(iv)), but only if the omissions "do not render the proposed [generic] less safe or effective than the listed drug for all remaining, nonprotected conditions of use." *Id.* § 314.127(a)(7). That exception also is not relevant here.

64.     Outside of the three recognized exceptions, FDA has no authority to waive the same labeling requirement for a generic drug. Indeed, the same labeling requirement is so absolute that

it preempts state law and shields the generic manufacturer from liability. *See, e.g.*, *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013) (the FDCA "prohibits generic drug manufacturers from independently changing their drugs' labels"); *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 616-618 (2011) (explaining "the duty of sameness" as demanding that "generic drug labels be the same at all times as the corresponding brand-name drug labels").

65.     The duty of sameness also continues after an ANDA is approved—if the labeling for the listed drug changes, the generic manufacturer must follow suit. Failure to do so will cause FDA to withdraw the ANDA's approval and may also render the generic misbranded. *See, e.g.*, *Breckenridge Pharm., Inc. v. FDA*, 754 F. App'x 1, 3, 6-7 (D.C. Cir. 2018).

## 2.     *Same conditions-of-use requirement*

66.     Another critical requirement for a generic drug is a demonstration that it has the same "conditions of use" as the listed drug.

67.     When an innovator like Vanda submits an NDA for a pioneer drug like HETLIOZ®, the innovator must submit proposed labeling for its product. *See* 21 U.S.C. § 355(b)(1)(vi). FDA then decides whether to approve the drug based primarily on "the conditions of use" described in that labeling. *Id.* § 355(d)(5).

68.     Among the most important conditions of use for a new drug are the restrictions imposed on the dispensing of the product. *See, e.g.*, 21 U.S.C. § 353(b).

69.     Generic applicants must copy the listed drug's conditions of use.  Every ANDA must contain information to show that the proposed conditions of use for the generic were previously approved for the listed drug. 21 U.S.C. § 355(j)(2)(A)(i); *see* 21 C.F.R. § 314.94(a)(4) (the applicant must submit a statement that the proposed conditions of use for the generic were previously approved for the listed drug). An ANDA cannot be received without such information (*see* 21 C.F.R. § 314.101(d)(2)-(3)), and it must be denied if the information is "insufficient to

15

show that each of the proposed conditions of [for the generic]" was "previously approved for the listed drug." 21 U.S.C. § 355(j)(4)(B); 21 C.F.R. § 314.127(a)(2). The statute and FDA regulations do not recognize any exception to this requirement.

### 3.    *Prohibition on untrue statements of material fact.*

70.    The FDCA and FDA regulations provide that the agency shall not approve an application for a drug that includes an "untrue statement of material fact." 21 U.S.C. § 355(j)(4)(K); 21 C.F.R. § 314.127(a)(13).

71.    Agency regulations require ANDA applicants to provide a "side-by-side comparison of the applicant's proposed labeling . . . with the labeling for the reference listed drug with all differences annotated and explained." 21 C.F.R. § 314.94(a)(8)(iv).

72.    FDA regulations governing ANDA applications also require "[a] statement that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the drug product have been previously approved for the reference listed drug" (21 C.F.R. § 314.94(a)(4)(i)) and "[a] statement that the applicant's proposed labeling . . . is the same as the labeling of the reference listed drug except for differences annotated and explained under paragraph (a) (8) (iv)" (*id.* § 314.94(a)(8)(iii)).

### 4.    *FDA's unlawful approval of Teva's ANDA*

73.    In 2018, Teva submitted ANDA No. 211601 seeking FDA's approval to market a generic version of tasimelteon. That application was tentatively approved in September 2021 and received final approval on or about December 12, 2022. Exhibit 20, Teva Final Approval Letter and Label.

74.    In the final approval letter, the national drug code (NDC) for the approved product was 0591-4490-30. *Id.*

75.     Teva's approved ANDA covers only an indication for Non-24, meaning that a significant number of Teva's target patient population will be blind individuals.

76.     The version of the package label that Teva proposed in its ANDA and is reproduced in the FDA's final approval letter does not contain Braille lettering. *See id.* at 8:



77.     The label also does not include instructions to dispense the product in its original container or to refrain from covering the Braille lettering.

78.     On information and belief, Teva failed to identify and adequately explain the differences between its labeling and the labeling for HETLIOZ®, including the lack of Braille, the lack of the instruction to dispense the product in the original container, and the lack of the instruction to not cover the Braille.

79.     On information and belief, Teva stated in its ANDA materials that its proposed labeling was the same as the labeling for HETLIOZ® and that its proposed conditions of use were the same conditions of use that had previously been approved for HETLIOZ®.

### 5.     *Teva's unlawful marketing and distribution of its tasimelteon product*

80.     On information and belief, on or about December 29, 2022, Teva began commercially marketing its product.

81.     On information and belief, on or about December 29, 2022, Teva began providing pricing information for its generic tasimelteon product to the "drug lists," including RED BOOK®. As indicated in those sources, Teva has set the wholesale acquisition cost for its generic tasimelteon product at approximately 86.4% of the wholesale acquisition cost for HETLIOZ®.

82.     On information and belief, Teva listed its generic tasimelteon product with FDA on or about January 3, 2023 and received NDC 0480-4490-56.

83.     As a result of that listing, the final approved labeling for Teva's generic tasimelteon product became publicly available on the defendants' "DailyMed" website. *See LABEL: TASIMELTEON capsule, gelatin coated,* DailyMed (as of Jan. 30, 2023), perma.cc/F8K7-BXTU.

84.     While Teva's FDA-approved label used NDC 0591-4490-30, Teva's label as publicly marketed uses NDC 0480-4490-56. *Compare* Exhibit 20, Teva Final Approval Letter and Label, *with* Exhibit 21, Teva DailyMed Label.

85.     On information and belief, the final labeling for Teva's generic tasimelteon product was not publicly available prior to its publication on DailyMed on or about January 3, 2023.

86.     DailyMed provides the following image of the bottle label for Teva's generic tasimelteon product:



*See* Exhibit 21, Teva DailyMed Label.

    **D.**    **The approval, marketing, and distribution of Teva's product are unlawful**

    87.    Both the DailyMed image and the package label included in the FDA final approval letter of Teva's generic product (*see* Exhibit 20, Teva Final Approval Letter and Label at 8; Exhibit 21, Teva DailyMed label), reveal multiple violations of the same labeling requirement:

    a.    Teva's labeling does not include the instruction "Dispense in original container" even though that the FDA specifically approved the instruction for HETLIOZ® labels;

    b.    Teva's labeling does not include the instruction "Do not cover Braille" even though that instruction was specifically approved by FDA when it approved HETLIOZ®.

    c.    Teva's labeling does not include any information in Braille at all even though FDA required Vanda to conduct a study of Braille labeling and recognized that Braille labeling was necessary to minimize the risk of medication error in the intended patient population.

88.     The DailyMed image and label in FDA's ANDA approval letter also reveals at least two violations of the same conditions of use requirement. First, there is no requirement that Teva's product be dispensed in its original container, even though FDA imposed that condition on HETLIOZ®. Second, there is no equivalent condition to Braille labeling, which means that Teva's product poses an unnecessary elevated risk of medication error.

89.     No exception justifies these violations. On information and belief, Teva never submitted a suitability petition and, in all events, the above differences do not pertain to the type of changes that can be made through the suitability petition pathway. These differences also cannot be justified by the fact that Teva is a different manufacturer than Vanda. As pertains to the dispensing or Braille labeling portions of HETLIOZ®'s label, there are no exclusivities or patents at issue. Nothing prevented Teva from including the correct dispensing instructions and Braille identifiers on the label of its product.

90.     The above violations imply still more. On information and belief, Teva's "side-by-side comparison" of its proposed labeling and the approved labeling for HETLIOZ® likely failed to identify these labeling differences in violation of 21 C.F.R. § 314.94(a)(8)(iv).

91.     On information and belief, the statements that Teva was required to make under 21 C.F.R. § 314.94(a)(4)(i) and 21 C.F.R. § 314.94(a)(8)(iii) were false, misleading, or materially incomplete. The statute and FDA's regulations both forbid the approval of ANDA that contains any "untrue statement of material fact." 21 U.S.C. § 355(j)(4)(K); 21 C.F.R. § 314.127(a)(13).

92.     In addition to omitting Braille from the label of its generic product, it does not appear that Teva makes any other efforts to meet the particular needs of the blind patients who comprise most of its target patient population, despite marketing its product as intended for blind individuals (Exhibit 22, Teva, *Pay as Little as $0\* for Teva's Generic Version of Hetlioz®*

*(tasimelteon) Capsules* (Jan. 24, 2023), perma.cc/6J59-YAJL (depicting an individual who appears to be blind)). For instance, Teva's tasimelteon information page contains no audio elements. *See* Exhibit 23, *Tasimelteon Capsules*, Teva, perma.cc/4RDM-SLCY (last visited Jan. 30, 2023).

93.     Because FDA's approval of Teva's ANDA was unlawful, it must be vacated and set aside, at least until such time as Teva's generic tasimelteon product is brought into compliance with the FDCA's same labeling and same conditions of use requirements.

94.     Until that occurs, each and every shipment of Teva's generic tasimelteon product stands as a violation of the FDCA's prohibition on introducing or delivering for introduction a new drug into interstate commerce without valid approval. *See* 21 U.S.C. §§ 331(d), 355(a).

95.     After seeing Teva's public marketing materials, final FDA-approved container label received through a FOIA request, and public DailyMed label, Vanda filed a citizen petition with FDA on January 25, 2023, requesting that the agency revoke its approval of Teva's ANDA and request a recall of Teva's product. *See* Exhibit 24, Citizen Petition Requesting FDA to Revoke Approval of ANDA No. 211601 and Request Recall, Docket No. FDA-2023-P-0313-0001 (Jan. 26, 2023), available at https://www.regulations.gov/document/FDA-2023-P-0313-0001.

96.     Vanda requested immediate action from FDA.

97.     Aside from assigning a docket number, FDA did not take immediate action on Vanda's petition and has, to date, not acted on the petition.

**E.     Immediate injunctive relief is critical**

**1.     *Teva's product endangers patients without justification***

98.     Teva's unlawful product threatens the public health. FDA is fully aware of the need for Braille labeling to reduce the risk of medication errors among the visually impaired. In 2012, Congress specifically called for the development of new standards regarding "access to information on prescription drug container labels for individuals who are blind or visually

impaired." Food and Drug Administration Safety and Innovation Act of 2012 § 904(a)(1), Pub. L. No. 112-114, 126 Stat. 993, 1090 (codified at 29 U.S.C. § 792 note). The statute specifically identified the use of Braille as a best practice. *Id.* § 904(a)(4)(A)(i), 126 Stat. at 1091.

99.    The United States Access Board, an independent federal agency that includes HHS officials, published standards in 2013. As the United States Access Board explained:

> Persons with visual impairments who cannot read print prescription drug container labels all too often report inadvertently taking the wrong medication, the wrong amount, at the wrong time, and under the wrong instructions, thereby endangering the health and safety of themselves and family members for whom they are caregivers.
>
> Without having ready access to their prescription drug container label information, persons with visual impairments are also at risk of taking expired medications, of not being able to obtain refills in a timely manner, and of being unable to detect pharmacy errors.
>
> The majority of persons who become blind or visually-impaired do so after age 60, a time when multiple medications are often prescribed and when persons may experience physical and cognitive conditions which heighten the necessity for safe, consistent, reliable, and independent access to prescription drug container label information.

Exhibit 25, U.S. Access Board, *Prescription Drug Container Labels* (July 10, 2013), perma.cc/E8KF-E3U6. As the statute had done, the U.S. Access Board recommended Braille prescription drug container labels as a best practice.

100.    The labeling for HETLIOZ® is consistent with the U.S. Access Board's best practice. The labeling for Teva's generic tasimelteon product is not.

101.    Further, FDA itself has voiced support for the manufacturers of brand name medications introducing Braille onto their labels, specifically invoking Hetlioz® as a successful example of an FDA-approved Braille label. *See* Exhibit 26, Mike Botta*, Braille in Pharma: Differing Views in the U.S. and Europe*, Pharmaceutical Processing World (Sept. 14, 2017), perma.cc/G3AE-H6QE

102.    The absence of Braille labeling on generic tasimelteon is of grave concern. Blind individuals taking prescription medications may struggle to differentiate between multiple medications or fail to administer the proper dose. *See, e.g.*, Exhibit 27, May Almukainzi et al., *Medication use patterns in the visually impaired in Saudi Arabia and the importance of applying Braille labeling* 28 Saudi Pharm. J. 274 (2020) (describing high risks of medication errors among blind individuals and the need for Braille packaging). Patients are at risk of confusing two drugs and taking the wrong one—perhaps at an inappropriate time of day or creating an unsafe interaction with other medications or substances. Blind individuals are forced to come up with *ad hoc* schemes to identify the proper bottle and avoid medication errors. *See id*. at 276 (describing methods like storing medications in different places, identifying medications by touch or smell, or marking the package). Of course, such efforts are fraught with risk.

103.    This risk is compounded in the case of tasimelteon. One disorder HETLIOZ® is intended to treat, and the *only* indication on Teva's generic tasimelteon is Non-24, a disorder that is estimated to affect more than *half* of totally blind individuals. And individuals who suffer from Non-24 frequently present with co-morbidities that may be treated with other medications.

104.    Further, as HETLIOZ®'s label advises in "Warnings and Precautions," "[a]fter taking HETLIOZ, patients should limit their activity to preparing for going to bed, because HETLIOZ can impair the performance of activities requiring complete mental alertness." Exhibit 18, Hetlioz Label at 1-2. Omitting Braille from generic tasimelteon increases the risk of taking the medication at the wrong time, putting people who do so in danger.

105.    While Braille labeling would be helpful on *any* drug container, it is extraordinarily beneficial and indispensable for tasimelteon containers due to the patient population.

106.    For individuals who have been taking HETLIOZ® daily to treat Non-24, they have had the benefit of Vanda's Braille labeling to help them identify the correct medication.

107.    Now, however, with the introduction of Teva's generic tasimelteon into the market *without* Braille labeling, blind patients who switch will no longer have Braille cues to help them identify their tasimelteon.

108.    The impact on patients is likely to be severe. A substantial percentage of patients are visually impaired and rely on the Braille label to identify HETLIOZ®, but when they receive Teva's generic product as a refill, they will immediately be deprived of their ability to differentiate their treatment for Non-24 from other medications.

109.    Because Braille labeling reduces medication error, the omission of Braille labeling from Teva's tasimelteon product will increase medication error, especially by those who are already accustomed to HETLIOZ® containers. Substituting a container without Braille labeling will only increase confusion and decrease safety. Blind individuals who take multiple medications are likely to have worked out a system to ensure they are taking their medications correctly. The sudden loss of an accommodation like Braille labeling risks patients confusing their tasimelteon product with other medications.

110.    Complicating the matter, a rare medication like HETLIOZ® will typically be delivered by mail, not picked up at a local pharmacy. Blind individuals receiving a largely unidentified package after their prescription switches from HETLIOZ® to Teva's generic product are at a heightened risk of suffering confusion and medication error.

111.    The risk to patients will only continue to grow over time. In many states, pharmacists are required to substitute generic drugs even when a doctor has prescribed the branded product. As things stand today, new prescriptions are likely to be filled with Teva's generic

tasimelteon product and existing HETLIOZ® prescriptions are likely to be switched to Teva's generic tasimelteon product at the next refill.

112. Patients may not even *know* that their tasimelteon no longer has Braille labeling when they pick it up at the pharmacy counter. Patients may thus be led to believe that they got the wrong medication and not take it, causing them to re-experience the severely debilitating effects of untreated Non-24.

113. What is more, there is no benefit whatsoever to removing the Braille labeling. Thus, Teva's labeling change not only fails to fall under statutory and regulatory exceptions, but it also makes the product less safe and less effective.

114. The removal of Teva's product from the market will not affect continuity of treatment because HETLIOZ® will remain available, and patients suffering from Non-24 are already accustomed to using HETLIOZ®.

115. There are no countervailing considerations, equitable or otherwise, that could justify FDA's approval of an unlawful, mislabeled product, and the agency is capable of correcting this situation without delay.

### 2.    *The Defendants' actions threaten irreparable harm*

116. The Defendants' actions also threaten imminent, severe, and irreparable harm to Vanda. Teva's ANDA should not have been approved and, as a result, Teva should not have been allowed to launch its generic tasimelteon.

117. Because HETLIOZ® represented roughly 65% of Vanda's revenue in 2021 and 2022, the injuries to Vanda if Teva continues to market its generic tasimelteon would be dire. It would not only risk Vanda's financial ruin, but Vanda would also lose critical revenue necessary for its several, significant research programs, as it reinvests more than 90% of its revenues into

research and development and operations. Vanda may also be forced to lay off irreplaceable staff, and the market for tasimelteon would forever erode.

118.     The increased direct competition for the product that generates the majority of Vanda's revenue threatens to irreparably reduce Vanda's market share dramatically and to cause severe price erosion, all on account of an ANDA that should never have been approved.

119.     Vanda's direct services has reduced patient attrition rates to the single digits. As more patients miss out on these services by switching to Teva's product, the attrition rate will rise markedly and the market will shrink. Without temporary injunctive relief, Vanda will be forced to operate in an enormously decreased market even if Teva's product is removed from the market later.

120.     Teva's ongoing presence in the market threatens to irreparably tarnish Vanda's good will and reputation as physicians, pharmacists, and consumers become accustomed to using Teva's unlawfully approved products as a substitute for HETLIOZ®. *See, e.g.*, *Celsis In Vitro, Inc., v. Cellzdirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

121.     The net effect of generic competition would be massive injury to Vanda's ongoing research and development efforts—both for new applications for use of HETLIOZ® as well as other innovative drugs in Vanda's pipeline.

122.     Vanda is attempting to develop new indications for HETLIOZ®, including jet lag disorder, insomnia, delayed sleep phase disorder (DSPD), and sleep disturbances for patients with autism spectrum disorder (ASD). But as Teva continues to distribute its product and other generics launch, Vanda will lose both the financial ability to fund these activities as well as the economic incentive to do so.

123.     Teva's ongoing marketing of its product will also cause Vanda to lose funds needed for its research and development into several other promising therapeutics, including products to address gastroparesis, secretory diarrhea disorders including cholera, and acute performance anxiety.

124.     These harms are caused directly by defendants' unlawful approval of Teva's ANDA despite Teva's failure to satisfy the same labeling and same conditions-of-use requirement.

125.     Because these harms are immediate and irreparable, Vanda cannot wait until the citizen petition is resolved. *See* 21 C.F.R. § 10.30(e)(2) (giving FDA 180 days to respond to citizen petitions); *id.* § 10.30(e)(2)(iv) (allowing the agency to respond with a "tentative response, indicating why the agency has been unable to reach a decision on the petition, e.g., because of the existence of other agency priorities, or a need for additional information").

## CLAIMS FOR RELIEF

### COUNT I
### Agency Action Not In Accordance With Law, 5 U.S.C. § 706(2)

126.     Vanda realleges and incorporates by reference the allegations contained in the preceding paragraphs.

127.     FDA's approval of Teva's ANDA was final agency action.

128.     FDA's approval of Teva's ANDA was contrary to law because it violated the same labeling requirement imposed by the FDCA and FDA's regulations.

129.     FDA's approval of Teva's ANDA was contrary to law because it violated the same conditions of use requirement imposed by the FDCA and FDA's regulations.

130.     FDA's approval of Teva's ANDA was contrary to law because, on information and belief, Teva did not comply with the requirements of 21 C.F.R. § 314.94.

131.    FDA's approval of Teva's ANDA was contrary to law because, on information and belief, Teva's application contained untrue statements of material fact.

132.    If FDA's approval of Teva's ANDA is not vacated and set aside, Vanda will suffer substantial and irreparable harm for which there is no adequate remedy at law.

### COUNT II
### Arbitrary and Capricious Agency Action, 5 U.S.C. § 706(2)

133.    Vanda realleges and incorporates by reference the allegations contained in the preceding paragraphs.

134.    FDA's approval of Teva's ANDA was final agency action.

135.    FDA's approval of Teva's ANDA was arbitrary and capricious because the agency did not impose the labeling and dispensing features and instructions that the agency had approved for HETLIOZ®.

136.    FDA's approval of Teva's ANDA was arbitrary and capricious because Teva's product threatens the public health, including the substantial contingent of visually impaired and blind patients who currently use HETLIOZ®.

137.    FDA's approval of Teva's ANDA was arbitrary and capricious because it "entirely failed to consider an important aspect of the problem" and failed to engage in reasoned decisionmaking. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Specifically, FDA did not consider the effect a sudden loss of a Braille labeling accommodation would have on the substantially blind patient population that currently uses HETLIOZ®. And nowhere did it explain why it approved the labeling difference.

138.    If FDA's approval of Teva's ANDA is not vacated and set aside, Vanda will suffer substantial and irreparable harm for which there is no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Vanda respectfully requests that the Court enter judgment in its favor and against the Defendants in the claims set forth above and respectfully requests that this Court:

    a.    declare that FDA's approval of ANDA No. 211601 was unlawful and a violation of the FDCA and FDA regulations;

    b.    declare that FDA's approval of ANDA No. 211601 was arbitrary and capricious;

    c.    vacate FDA's approval of ANDA No. 211601 or, in the alternative, suspend FDA's approval of ANDA No. 211601 until such time as the ANDA is brought into full compliance with the FDCA and FDA regulations;

    d.    compel FDA to order Teva to immediately recall all shipments or sales of its generic tasimelteon product and cause product to be destroyed or relabeled in a manner that fully complies with the FDCA and FDA regulations;

    e.    award Vanda such further and additional relief as this Court deems just and proper.

Dated:  January 31, 2023

/s/ *Paul W. Hughes*
Paul W. Hughes (D.C. Bar No. 997235)
Sarah Hogarth (D.C. Bar No. 1033884)
Connor J. Suozzo (admission application pending)
Emmett Witkovsky-Eldred (*pro hac vice* forthcoming*)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Attorneys for Plaintiff*
*Vanda Pharmaceuticals Inc.*


*Admitted to practice in Pennsylvania only. Supervised by members of the D.C. Bar.