## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**VANDA PHARMACEUTICALS, INC.,**

       Plaintiff,

   v.

**UNITED STATES FOOD AND DRUG
ADMINISTRATION,** *et al.*,

       Defendants,

and

**TEVA PHARMACEUTICALS USA, INC.,**

       Intervenor-Defendant.

</td><td>

Civil Action No. 23-280 (TSC)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

Plaintiff Vanda Pharmaceuticals, Inc. has sued the Food and Drug Administration ("FDA"); its Commissioner, Robert M. Califf; the Department of Health and Human Services; and its Secretary, Xavier Becerra (collectively, "Defendants"). Am. Suppl. Compl. ¶¶ 9–13, ECF No. 44-1. Plaintiff alleges that Defendants violated the Administrative Procedure Act ("APA") in approving an application by Teva Pharmaceuticals USA, Inc. ("Teva") to market the generic drug tasimelteon, and in denying Plaintiff's petition to revoke that approval. *Id.* ¶¶ 3–8. Teva intervened as a defendant, *see* Feb. 5, 2023 Min. Order, and the parties have cross-moved for summary judgment. For the reasons set forth below, the court will DENY Plaintiff's Motion for Summary Judgment, ECF No. 47; GRANT Teva's Cross-Motion for Summary Judgment, ECF No. 48; and GRANT Defendants' Cross-Motion for Summary Judgment, ECF No. 50.

# I.    BACKGROUND

## A.  Statutory and regulatory framework

The Federal Food, Drug, and Cosmetic Act ("FDCA") requires that drug manufacturers apply for and receive FDA approval before marketing any new drugs. 21 U.S.C. § 355(a). When a drug is the first of its kind, applicants must submit extensive information about its safety, effectiveness, composition, production, and labeling. *Id.* § 355(b)(1)(A). The FDA must carefully evaluate that information—verifying its accuracy and considering the new drug's risks and benefits—before approving an application. *Id.* § 355(d). The process of securing approval for such "pioneer" drugs is thus often "expensive and time-consuming." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1079 (D.C. Cir. 2001).

In contrast, if a manufacturer seeks approval to market a generic version of a pioneer drug that the FDA has already approved, it can do so through an abbreviated new drug application ("ANDA"). 21 U.S.C. § 355(j). The ANDA need not provide independent evidence that the proposed generic drug is safe or effective for its intended use. Instead, it must show that the generic drug is "the same" as its pioneer counterpart. 21 U.S.C. § 355(j)(2)(A)(i)–(v), 355(j)(4)(B)–(G); 21 C.F.R. §§ 314.94, 314.127. That showing allows the generic manufacturer to "piggyback[] on the original manufacturer's evidence of safety and efficacy," *Teva Pharms., USA, Inc. v. Leavitt*, 548 F.3d 103, 104 (D.C. Cir. 2008), and thus to "develop generic drugs inexpensively, without duplicating the clinical trials already performed on the equivalent brand-name drug," *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 612 (2011). "In creating this shortcut, Congress sought to encourage the development of generic drugs to increase competition and lower prices," *Amgen Inc. v. Hargan*, 285 F. Supp. 3d 351, 358 (D.D.C. 2018) (citation and quotation marks omitted), thereby increasing the availability of beneficial drugs without introducing any new dangers.

By law, each ANDA must contain certain information demonstrating that the generic drug is the same—and therefore as safe—as the pioneer one. For instance, the ANDA must show that

> (1) the generic drug is "bioequivalent" to the pioneer drug; (2) its active ingredients, route of administration, strength and dosage form are "the same as" those of the pioneer drug; and (3) the inactive ingredients are not "unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug."

*Zeneca, Inc. v. Shalala*, 213 F.3d 161, 164 (4th Cir. 2000) (quoting 21 U.S.C. § 355(j)(4)(C), (D), (H)).

Two ANDA requirements are particularly relevant here. First, the FDCA requires each ANDA to "show that the labeling proposed for the new drug is the same as the labeling approved for the [pioneer] drug." 21 U.S.C. § 355(j)(2)(A)(v). That showing matters because the FDA's approval of the pioneer drug depends on whether it is "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof," and whether its label is "false or misleading." *Id.* § 355(d). The FDCA does not require that showing, however, if there are label "changes required . . . because the new drug and the [pioneer] drug are produced or distributed by different manufacturers." *Id.* § 355(j)(2)(A)(v). FDA regulations elaborate on that exception and provide potential examples, explaining that such label changes "may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity." 21 C.F.R. § 314.94(a)(8)(iv).

The FDA has interpreted the "different manufacturers" exception to permit generic manufacturers to depart from the pioneer drug label where the original manufacturer had "voluntarily adopted" certain standards "that are more onerous or rigorous than the standards FDA

has determined are necessary." Corrected Confidential J.A. at 357, ECF No. 59-1 ("J.A.").[1] For example, the FDA has approved generic labels that included "only one disposal method where the [pioneer drug] labeling included two," or "did not include halal and kosher certifications in their labeling, where the [pioneer drug] did," or "did not include a statement about peanut protein testing included in the [pioneer drug] labeling." *Id.* at 885. Likewise, the FDA has approved a generic drug label that "included an ingredient safety warning that was not in the [pioneer drug] labeling, where the generic manufacturer chose to formulate its product with a different inactive ingredient." *Id.* Finally, the FDA has "also considered differences in font, color, trade name, and other trade dress to be permissible differences due to different manufacturers," noting that "nearly all generic drug product labeling" changes at least some of those aspects from the original brand-name drug label. *Id.*

The second relevant ANDA requirement is related to the first: Each ANDA must "show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved" for a pioneer drug. 21 U.S.C. § 355(j)(2)(A)(i). The FDA defines "conditions of use" to refer to "how, to whom, and for which purposes a drug product is administered." J.A. at 890. There are no exceptions to this requirement.

**B.  Factual record**

This case involves medication developed to treat Non-24-Hour Sleep-Wake Disorder ("Non-24"). Mem. in Supp. of Pl.'s Mot. Summ. J. at 4, ECF No. 47-1 ("Pl.'s MSJ"). Non-24 is a "chronic disorder in which the body cannot synchronize its internal circadian rhythmicity—the process that regulates the sleep-wake cycle—with the 24-hour day." *Id.* (citing J.A. at 500, 508–

---

[1] The court's citations to the J.A. refer to the Bates number of the cited page in the administrative record—*e.g.*, this citation to page 357 corresponds to the J.A. page labeled "FDA000357," even though that is the 180th page of the docketed PDF file containing the J.A.

21).  Individuals affected by Non-24 experience patterns of sleep, body temperature, and hormone rhythm that misalign with ordinary day-night cycles, leading to nighttime insomnia and excessive daytime sleepiness.  *Id.* at 4–5 (citing J.A. at 509–10, 512–13).  People suffering from blindness are frequently affected by Non-24 because they do not "register the light signals which are needed to fine-tune the body clock to a 24-hour day." *Id.* at 5 (quoting J.A. at 511).  The FDA "estimate[s] that over half of totally blind individuals suffer from Non-24 and that approximately 100,000 people in the United States have the disorder." *Id.* (quoting J.A. at 524).

In 2014, the FDA granted Plaintiff approval to market the drug tasimelteon under the brand name "Hetlioz." J.A. at 880.  Hetlioz treats Non-24 by "bind[ing] to and activat[ing] receptors in the brain for melatonin, a hormone that regulates the sleep cycle."  Am. Suppl. Compl. ¶ 20.  During the new drug application process, Plaintiff voluntarily proposed including braille lettering on the Hetlioz label to assist blind individuals in reading it.  J.A. at 477.  While the FDA did not require that inclusion, it did require Plaintiff "to provide a certified translation of the braille; to justify [the] decision not to include more information in braille; and to conduct a labeling comprehension study to assess the risk that braille could cause medication errors."  Federal Defs.' Opp'n to Pl.'s Mot. for Summ. J. & Mem. in Supp. of Cross-Mot. for Summ. J. at 9, ECF No. 50-1 ("Defs.' MSJ") (citing J.A. at 282–88, 568, 570, 876–78); *see* J.A. at 904.  The FDA also required Plaintiff to include two printed statements in bold Roman script on the label: "Dispense in original container" and "Do not cover Braille." J.A. at 696–99.  Plaintiff complied with those requirements.  "Thus, the approved container label for Hetlioz includes" those two printed statements, along with "the Hetlioz name and [20 mg] dosage strength in both Roman script and braille."  Defs.' MSJ at 9 (citing J.A. at 719–51); *see* Am. Suppl. Compl. ¶ 47 (displaying approved label).

In 2018, Teva submitted an ANDA, seeking approval to market generic tasimelteon—and proposing a label without braille lettering.  J.A. at 9.  The FDA's review of the ANDA involved consultation with several internal offices about the lack of braille.  *Id.* at 19–21 (record of initial labeling review); *see also id.* at 24–39, 42–57, 69–89, 90–112, 120–41 (reiterating these consultations in subsequent labeling reviews).  Two officials from the Division of Psychiatry initially expressed uncertainty, indicating that they were "not sure that folks for whom the product is intended could use the product safely if they can't read the label. . . .  So, even if [the original manufacturer] didn't *need* to add braille, now that they have it, it seems like it might be less safe to not have braille on the generics."  *Id.* at 1, 20.  But the Medical Officer in the Office of New Drugs did not perceive any significant safety concerns, stating that while the Hetlioz label's braille was "a nice idea (and probably helps with public relations) . . . , the Agency did not require it," and that he did not see a "need to require generic manufacturers to include braille."  *Id.* at 20.  Based on these responses, the FDA ultimately determined that the braille labeling, while "nice to have," was "not a requirement for the generic products" because it "was not [a] condition of approval" for Hetlioz.  *Id.* at 19.  The FDA also recommended that Teva remove the printed statements "Dispense in original container" and "Do not cover Braille" from its label, as they were no longer necessary.  Defs.' MSJ at 9–10 (citing J.A. at 4, 10, 12, 19, 22).

The FDA granted Teva approval to market its generic version of tasimelteon in December 2022, shortly after Plaintiff's exclusive license to a patent on tasimelteon expired.  Teva's Combined Cross-Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summ. J. at 7, 10, ECF No. 48-1 ("Teva's MSJ") (citation omitted).  Teva's finalized label, like Hetlioz's, stated the product name and dosage strength in Roman script, along with instructions for use and storage.  J.A. at 10.  But in addition to some differences in font, arrangement, and design, Teva's label did not include

braille lettering restating its product name and dosage, and did not include the printed statements "Dispense in original container" or "Do not cover Braille." *Compare* Am. Suppl. Compl. ¶ 47 (displaying Hetlioz label), *with id.* ¶ 91 (displaying Teva's generic label).  Teva began marketing its generic tasimelteon on December 28, 2022.  Teva's MSJ at 10.

## C.  <u>Procedural posture</u>

Soon after Teva began marketing generic tasimelteon, Plaintiff challenged its ANDA approval in proceedings before the FDA and this court.  On January 25, 2023, Plaintiff filed a "citizen petition" with the FDA—a procedure for interested parties to ask the FDA "to issue, amend, or revoke a regulation or order."  21 C.F.R. § 10.25(a); *see* J.A. at 474–489.  Plaintiff's petition "demand[ed] that the Commissioner of Food and Drugs immediately revoke the approval" of Teva's ANDA and "order a recall of Teva's product."  J.A. at 474.  It contended that because Teva's label lacked braille and the two accompanying printed statements, it violated laws requiring generic labels to be the same as, and to include the same conditions of use as, the original pioneer drug label.  *Id.* at 474–75.  And it warned that those differences "pose[d] grave danger to public health and patient safety."  *Id.* at 474.

Plaintiff brought this suit six days after filing the citizen petition and sought a preliminary injunction eight days after that.  *See* Compl., ECF No. 1; Pl.'s Mem. in Supp. of Mot. for Prelim. Inj., ECF No. 7-1 ("Mot. for Prelim. Inj.").  The arguments Plaintiff raise here mirror those in its citizen petition: that Teva's approval violated "the statutory and regulatory requirements that an ANDA holder propose the same labeling and same conditions of use as the [brand-name] drug of which it is a generic," and that it "risk[ed] substantial public-health harms."  Compl. ¶¶ 3–4; *see* J.A. at 474.  Thus, Plaintiff raises claims under the APA, asserting that the approval was both "contrary to law" and "arbitrary and capricious."  *Id.* ¶¶ 126–38 (citing 5 U.S.C. § 706(2)).  The Complaint asks the court to declare Teva's ANDA unlawful, vacating or suspending its approval,

then to compel FDA to recall all of Teva's generic tasimelteon, destroying or properly relabeling it.  Compl. at 29.  Plaintiff sought essentially the same relief in a preliminary injunction.  Mot. for Prelim. Inj. at 42 (seeking "a preliminary injunction suspending FDA's approval of Teva's unlawfully approved ANDA" and forcing a "recall [of] all product produced pursuant to this ANDA").  The court granted Teva's motion to join the case as an intervenor-defendant.  Feb. 5, 2023 Min. Order.

Both of Plaintiff's initial challenges were rebuffed.  This court denied the preliminary injunction in March 2023, explaining that Plaintiff "failed to meet its burdens with respect to clear showings on irreparable harm, the balance of equities, and the public interest."  Tr. of Hr'g on Mot. for Prelim. Inj. at 44:25–45:5, ECF No. 36; *see* Order, ECF No. 30.  Several months later, the FDA denied Plaintiff's citizen petition, reasoning that "the omission of braille on the generic tasimelteon products' container labeling is a permissible difference due to difference in manufacturer," that "omitting the special instructions, 'Dispense in original container" and "Do not cover Braille' on the container labeling for the generic tasimelteon products [does not] violate[] the 'conditions of use' requirements," and that "the differences in labeling . . . do not raise any safety concerns."  J.A. at 895; *see id.* at 879–95.  Following a consent motion from the parties, the court granted Plaintiff leave to file the Amended and Supplemental Complaint, which added allegations and legal challenges related to the citizen petition's denial.  Mar. 4, 2024 Min. Order; *see generally* Am. Suppl. Compl.

Before the court are cross-motions for summary judgment from Plaintiff, Defendants, and Teva.  Plaintiff argues that the approval of Teva's ANDA and the denial of Plaintiff's petition are unlawful because they violate the sameness requirements for generic labels and conditions of use, and because the FDA's decision-making was arbitrary and capricious.  *See* Pl.'s MSJ at 1–4.

Defendants and Teva contest each of those arguments and seek judgment rejecting Plaintiff's claims and validating the FDA's actions.  Defs.' MSJ at 1–4; Teva's MSJ at 1–4.  The parties' motions all rely on the Joint Appendix, which compiles the relevant portions of the administrative record.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In an APA challenge, however, a district court may only set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  And because that standard turns on the evidence and law before the agency, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  "The entire case on review is a question of law."  *Am. Bioscience*, 269 F.3d at 1083 (citation and quotation marks omitted).  The challenging party bears the burden of establishing that the agency action violated the APA.  *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

Plaintiff claims that the FDA's actions were both (1) arbitrary and capricious and (2) not in accordance with law, and those two claims implicate distinct legal standards.  An agency "acts arbitrarily or capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997–98 (D.C. Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  A court "is not to substitute its judgment for

that of the agency." *State Farm*, 463 U.S. at 43.  And where the agency action relied on a "scientific determination" within "its area of special expertise," a court "must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

Evaluating a claim that agency action is contrary to law necessarily involves interpreting the relevant statutes and regulations.  The Supreme Court recently held that "courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024).  In doing so, however, courts may "seek aid from the interpretations of those responsible for implementing particular statutes.  Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  But before reaching any conclusion, the "court must exhaust all the traditional tools of construction"—considering the law's "text, structure, history, and purpose." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (citation and quotations marks omitted).

### III.    ANALYSIS

Plaintiff challenges the approval of Teva's ANDA—and the FDA's denial of its citizen petition to revoke that approval—on three grounds.  First, that Teva's changes to the generic tasimelteon label violated the statutory same-label requirement and were not permitted by the exception for different manufacturers.  Second, that the changes unlawfully altered the drug's conditions of use.  And third, that the FDA's decision-making process was arbitrary and capricious in several respects.  All three challenges fail.

### A.  <u>Same-labeling requirement</u>

The FDA did not unlawfully approve Teva's ANDA, which proposed a generic label without braille lettering voluntarily included on the Hetlioz label, but provided the same

information in printed Roman text, and which the FDA concluded would not affect the drug's safety or efficacy.

    1. <u>Statutory construction</u>

Plaintiff's first claim is that Teva's ANDA did not comply with the FDCA requirement to contain "information to show that the labeling proposed for the new drug is the same as the labeling approved for the [pioneer] drug." 21 U.S.C. § 355(j)(2)(A)(v); *see* 21 C.F.R. § 314.94(a)(8)(iv). As noted above, there is an important exception to that same-label requirement, allowing for label "changes required . . . because the new drug and the [pioneer] drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v); *see* 21 C.F.R. § 314.94(a)(8)(iv). The primary inquiry here is the scope of that different-manufacturer exception—specifically, whether it permitted the FDA to approve Teva's ANDA despite lacking the braille lettering and accompanying printed statements that appeared on the Hetlioz label. After considering all the "traditional tools of construction"—the law's "the text, structure, history, and purpose," *Kisor*, 588 U.S. at 575 (citation and quotations marks omitted)—the court concludes that the approval was lawful.

"In addressing a question of statutory interpretation, we begin with the text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (quoting *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018)). Unless the law specifies otherwise, courts apply its plain meaning. *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011). But a provision's meaning is not always plain from its words, especially if they are read in isolation. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 537 (2015) ("Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things.").

Here, the parties diverge in defining key words in the different-manufacturer exception. Take the term "required," for instance, which often means "need[ed]" or "necessary." *Require*, Webster's Third New Int'l Dictionary 1929 (1986). Plaintiff focuses heavily on that definition, asserting that the exception authorizes only labeling changes "demand[ed] by virtue of a law, regulation, etc.," such that it "does not apply" where "it was clearly possible" for a generic manufacturer to perfectly imitate the brand-name drug label. Pl.'s Combined Reply. in Supp. of Pl.'s Mot. for Summ. J. & Opp'n to Defs.' Cross-Mots. for Summ. J. at 5, ECF No. 52 ("Pl.'s Reply) (quoting *Require*, Webster's New World Dictionary 1208 (2d coll. ed. 1986)); *id.* at 26; *see* Pl.'s MSJ at 27. But "required" can also mean "suitable or appropriate in a particular case." *Require*, Webster's Third New Int'l Dictionary 1929 (1986). Defendants appear to favor this definition instead, contending that the exception "permits labeling differences that flow from a generic manufacturer's permissible choices about its proposed product," with permissibility "determined on a case-by-case basis, considering the statutory and regulatory requirements and the effect of the difference on safety and efficacy." Defs.' MSJ at 2; *see also* Teva's Reply in Supp. of Cross-Mot. for Summ. J. at 4–5, ECF No. 54 ("Teva's Reply").

That's not the only definitional dispute. The parties also offer competing interpretations of the word "because" in the exception. Teva observes that "because" is typically understood in statutes "to indicate only 'but-for' causation—*i.e.*, 'the [effect] would not have occurred in the absence of—that is, but for— [the cause].'" Teva's MSJ at 17 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347–348, 350 (2013)). Thus, it contends, the exception allows label changes "for which the existence of a new manufacturer is a but-for, but not sole, cause." *Id.* Plaintiff argues instead that "because" must be read alongside the preceding word "required" to allow changes caused only by "the presence of a different manufacturer." Pl.'s Reply at 4, 12–14.

The briefing thus illustrates the range of possible interpretations for the different-manufacturer exception's bare text.  On the one hand, if "required" is interpreted broadly and "because" refers to but-for causation, the exception might be read to permit label changes so long as they are merely convenient for and chosen by the generic manufacturer.  On the other hand, if "required" and "because" are understood in their strictest senses, all label changes are prohibited unless "it would be impossible for a generic manufacturer to use the same labeling as the brand manufacturer."  Defs.' MSJ at 29; Pl.'s Reply at 26.  Thus, depending on the definitions selected, the very same words in the different-manufacturer exception could be read to permit almost all generic label changes, or almost none at all.

The court need not consider the full spectrum of the exception's possible meanings, however, because the parties rightly agree on several critical limiting principles.  To begin, everyone agrees that the exception does not wholesale authorize "any change that FDA elects to approve"—a reading that would defeat the same-label requirement.  Pl.'s Reply at 9; *see* Federal Defs.' Reply in Supp. of Cross-Mot. for Summ. J. at 9, ECF No. 55 ("Defs.' Reply"); Teva's Reply at 5–6.  Rather, the FDA must—at the very least—ensure that a generic manufacturer's proposed changes fully comply with applicable statutory and regulatory provisions, including the safety and efficacy requirements that the same-label requirement serves.  Defs.' Reply at 9–11; Teva's Reply at 5–6; *see supra* Section I.A. (explaining the relationship between 21 U.S.C. § 355(j)(2)(A)(v) and § 355(d)).  At the other end of the spectrum, there is consensus that the exception permits at least some changes to the label that reflect optional choices by the generic manufacturer, such as "omitt[ing] halal or kosher certifications", or "tinker[ing] with label colors or font."  Pl.'s Reply at 21–22; *see* Defs.' Reply at 6; Teva's MSJ at 19.  Plaintiff also acknowledges that label changes reflecting "allowable product differences" are permitted.  Pl.'s Reply at 26.  Indeed, it seems likely

that the parties' respective interpretations of the exception would lead to the same conclusion about whether most label changes are allowed.

The parties' agreement substantially narrows the interpretive question before the court, and two facts specific to this case narrow it even further. First, Plaintiff's decision to include braille lettering on the Hetlioz label was itself voluntary, not required by the FDA for safety or efficacy reasons. *See* Defs.' MSJ at 8–9 (citing J.A. 887, 904). Second, the information conveyed by that braille lettering—the Hetlioz name and 20 mg dosage strength—was also printed in Roman script on the label. *Id.* (citing J.A. 719–51). Consequently, the different-manufacturer exception presents only the following, limited question: If a pioneer drug label includes a voluntary element that is not necessary for safety, can the FDA approve a generic version of that label that chooses not to adopt the voluntary element but still conveys the same information?

Reading the different-manufacturer exception's text in accordance with its statutory context, purpose, history, and precedent, the court concludes that the FDA did not unlawfully approve Teva's ANDA. As explained in Section I.A., the exception is nested within a broader set of requirements that each ANDA contain information showing that the generic drug is the same as is pioneer counterpart. *See* 21 U.S.C. § 355(j)(2)(A). Those sameness requirements mirror the showings of safety and efficacy that the pioneer drug manufacturer must make in its new drug application. *Id.* § 355(d). Here, the same-label requirement at issue corresponds to the required showing for the pioneer drug that it is "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof," and that its label is not "false or misleading." *Id.* That structural congruence strongly suggests that the ANDA requirements share the same function as their counterparts for pioneer drugs: ensuring each drug's safety and efficacy. *See Leavitt*, 548 F.3d at 104. So long as the FDA adequately evaluates those concerns, *see infra* Section III.C., the

statute's structure does not suggest that the FDA must categorically reject generic label changes like the omission of braille lettering. To the contrary, the FDCA should be read as "a symmetrical and coherent regulatory scheme." *Mellouli v. Lynch*, 575 U.S. 798, 809–10 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

Relatedly, interpreting the different-manufacturer exception to allow the FDA to consider generic proposals for safe changes to voluntary label features also aligns with how the FDCA treats other ANDA requirements. For example, the FDCA does not demand that generic drugs be chemically identical to pioneer drugs in every respect. Rather, it requires the same active ingredients and a "bioequivalence" between the drugs—meaning that there is no "significant difference" in their "rate and extent of absorption." 21 U.S.C. § 355(j)(2)(A)(ii), (j)(2)(A)(iv), (j)(8)(B)(i). In this way, the FDCA provides for a degree of flexibility in the very formulation of generic drugs, so long as they are similar enough to maintain the pioneer drug's proven safety and efficacy. The ANDA same-label requirement and the different-manufacturer exception should be interpreted "consistent with th[at] statutory scheme." *Ass'n of Civilian Technicians, Inc. v. United States*, 603 F.3d 989, 993 (D.C. Cir. 2010); *see id.* at 992 ("[W]ords are to be read in the context in which they are used and in the broader context of the statutory scheme."). It would be aberrant to read the FDCA as permitting safe variation in a generic drug's substance, but not in its label.

Given the broader statutory context and purpose, it is unsurprising that the FDA has frequently approved ANDAs that proposed safe changes to optional features of the brand-name drug label. Some such changes are expressly recognized by regulation, including label "differences in expiration date, formulation, bioavailability, or pharmacokinetics." 21 C.F.R. § 314.94(a)(8)(iv). Other changes have received approval after an individualized determination, including (1) "an ingredient safety warning that was not in the brand labeling where the generic

manufacturer chose to formulate its product with a different inactive ingredient"; (2) "labeling that did not include a statement about peanut protein testing included in the [brand] labeling"; (3) "discussing only one disposal method where the [brand] labeling included two"; (4) "generic product that did not include halal and kosher certifications in their labeling, where the [brand label] did"; and (5) "differences in font, color, trade name, and other trade dress." J.A. at 885. Plaintiff does not contend that any of these approvals were unlawful.

The FDA's repeated approvals of comparable changes in generic label ANDAs "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA." *Loper Bright*, 144 S. Ct. at 2262 (quoting *Skidmore*, 323 U.S. at 140). Moreover, they demonstrate that the FDA's approval of Teva's ANDA is "consisten[t] with earlier and later pronouncements," which adds further weight to the agency's interpretation here. *Skidmore*, 323 U.S. at 140; *see also, e.g.*, *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 487 (2004) (explaining that, for these reasons, courts "normally accord particular deference to an agency interpretation of 'longstanding' duration" (quoting *Barnhart v. Walton*, 535 U.S. 212, 220 (2002))). While the FDA's expertise and practice "lack[] power to control" in this context, they supply ample "power to persuade" the court of the interpretation underlying the approval of Teva's ANDA. *Skidmore*, 323 U.S. at 140.

Judicial precedent confirms that conclusion. While challenges like Plaintiff's are rare, courts that have reviewed analogous FDA approvals have universally upheld them. In *Zeneca, Inc. v. Shalala*, a generic manufacturer elected to use a different inactive ingredient than the pioneer drug had, and therefore proposed a label that included a changed warning specific to that different inactive ingredient. 213 F.3d at 165–66. As in this case, the fact that the generic manufacturer was different from the brand-name one did not compel it to change its label (or make

the corresponding ingredient substitution).  *See id.*  Nonetheless, the Fourth Circuit held that the FDA's approval of that change was consistent with the different-manufacturer exception, given that it reflected "a permitted variation" and complied with FDA safety guidelines.  *Id.* at 169.  Teva's ANDA likewise reflects an otherwise permissible (*e.g.*, safe, effective, and accurate) choice about its label.

The facts in *Bristol-Myers Squibb Co. v. Shalala* were similar.  91 F.3d 1493 (D.C. Cir. 1996).  There, the FDA had approved a generic drug label even though it omitted one or more "indications"— particular diseases or conditions that the drug can be used to treat—that were on the brand-name label.  *Id.* at 1496.  FDA regulations expressly permit such omissions where the brand label feature is "protected by patent" or otherwise "accorded exclusivity."  21 C.F.R. § 314.94(a)(8)(iv).  In holding that the different-manufacturer exception "does accommodate" such omissions, the D.C. Circuit relied on the FDCA's structure, which required all conditions of use included on the generic label to have been previously approved; but did not conversely require all previously approved conditions of use to be included on the generic label.  91 F.3d at 1500 (citations and quotation marks omitted).  "In other words," the Circuit explained, "the statute expresses the legislature's concern that the new generic be safe and effective for each indication that will appear on its label; whether the label for the new generic lists every indication approved for use of the pioneer is a matter of indifference."  *Id.*  As explained above, the FDCA's structure conveys a similar message here:  Congress's concerns for safety and effectiveness obligated the FDA to vet Plaintiff's initial, optional inclusion of braille on the Hetlioz label, but the statute is indifferent to the omission of that feature on Teva's generic label—so long as removing the braille did not implicate those concerns.

The more recent opinions in *Hill Dermaceuticals, Inc. v. FDA* followed suit.  No. 11-CV-1950 (RCL), 2012 WL 5914516 (D.D.C. May 18, 2012), *aff'd*, 709 F.3d 44 (D.C. Cir. 2013).  That case concerned a brand-name label statement detailing the specific peanut protein testing used for the pioneer drug, which included refined peanut oil.  *Id.* at *3.  Years after the brand-name label was approved, the FDA concluded that the specific peanut protein test was no longer necessary, so long as the peanut oil met industry refining standards.  *Id.* at *5.  Accordingly, it advised against including the statement about peanut protein testing on the drug label.  *Id.* at *6.  And when a generic manufacturer proposed a label without the statement, the FDA allowed—though did not require—that omission, relying on its determination that the test was "scientifically unnecessary to protect the public health."  *Id.* at *6–7, *15–16.  The district court found "ample evidence . . . that the 'different manufacturers' exception allows the difference in labeling," noting that the FDA "thoroughly examined the facts and provided a reasoned explanation why" the change was permissible.  *Id.* at *17.  The D.C. Circuit affirmed, relying in part on the regulation permitting different-manufacturer changes "made to comply with current FDA labeling guidelines or other guidance," 709 F.3d at 48 (citing 21 C.F.R. § 314.94(a)(8)(iv))—regardless of whether that guidance is mandatory or, as in that case, optional.

While each of these cases involved different applications of the different-manufacturer exception, their through-line is clear:  Courts have consistently interpreted the exception to permit approval of generic labels with changes resulting from the generic manufacturer's otherwise permissible design choices and shown to maintain the drug's safety and effectiveness.  That interpretation is in keeping with the FDA's longstanding position and practice, and it comports with the core purposes of the FDCA's requirements for ANDA approval.  It is also particularly appropriate here, where the braille lettering was not required for Hetlioz's approval, and where

Teva's label conveys the same information in a different form.  Accordingly, the FDA's approval of Teva's ANDA did not violate the FDCA.

2. <u>Plaintiff's counterarguments</u>

Plaintiff advances a competing interpretation of the different-manufacturer exception and raises several objections to any reading broader than its own.  But Plaintiff's preferred interpretation is unworkable, and its objections are not persuasive enough to discard the settled understanding of the FDCA.

Plaintiff initially reads the exception to say that if a generic manufacturer can match the brand-name label, it must do so.  *See, e.g.*, Pl.'s MSJ at 27 ("Because it was clearly possible for Teva to include Braille lettering, the different-manufacturer exception does not apply."); *id.* at 29 ("FDA has given away the game by *admitting* that generic manufacturers *can* include Braille lettering on their label.").  But Plaintiff's own concessions show that the interpretation cannot be so straightforward.  Plaintiff acknowledges, for instance, that the label difference in *Zeneca* resulted from "the generic manufacturer's choice to use a different preservative"—*i.e.*, that the generic label could have been the same, but was not.  Pl.'s Reply at 24 (discussing *Zeneca*, 213 F.3d at 169).  Nonetheless, Plaintiff endorses the generic label's approval in that case, as it does for the FDA's approval of other optional label changes, like omitting kosher and halal certifications.  *Id.* at 21–22.

Recognizing that tension, Plaintiff's reply proposes a refined reading of the exception that would prohibit only generic label changes that are "detached from the manufacturing process."  *Id.* at 6 n.3; *id.* at 15 ("Generic manufacturers may make certain choices in crafting their generic products, and these decisions may trigger the different manufacturer exception to the same-labeling requirement."); *see also id.* at 21–22, 26.  But that reading has its own problems.  First, it remains incompatible with Plaintiff's continued insistence that the exception "authorizes *only*

those labeling changes when *the presence* of a different manufacturer in fact requires the change." *Id.* at 4 (emphasis altered). The mere presence of a different generic manufacturer in *Zeneca* did not compel it to change its preservative and label, for instance. *See* 213 F.3d at 165, 169. Second, there is no basis in the different-manufacturer exception's text for the carve-out Plaintiff proposes. At best, then, Plaintiff's proffered exception-to-the-exception could be understood as broadening the possible scope of "required" changes based on inferences from the FDCA's structure. But as explained in the previous section, that structural analysis supports rather than undermines the approval of Teva's ANDA.

Moreover, Plaintiff's allowance for what it artfully terms "manufacturer difference," Pl.'s MSJ at 28, does not account for another set of label changes that it concedes are permissible: modifications that (like braille) alter the presentation—but not content—of information on the label, such as "color or font." Pl.'s Reply at 20. To be sure, some variations in trade dress could be in a sense "required" to avoid intellectual property violations and thus "demand[ed] by virtue of a law, regulation, etc." as Plaintiff suggests. *Id.* at 5 (quotation omitted); *see id.* at 16 n.7, 19–20; *see also* 21 C.F.R. § 314.94(a)(8)(iv) (contemplating generic changes to "other aspect[s] of labeling protected by patent or accorded exclusivity"). But that possible subset weighs little in the analysis because the FDA is not in a position to parse legally necessary font and color changes from merely voluntary ones. *See Am. Bioscience*, 269 F.3d at 1080 (noting that the FDA, "based on its acknowledged lack of expertise and resources, has refused to become involved" in intellectual property disputes).

As for all other changes to color and font, Plaintiff dismisses them as "de minimis" label features and therefore permissible under the exception. Pl.'s Reply at 20.[2] By contrast, Plaintiff contends, braille lettering is critical for patient safety and access to tasimelteon—even though it likewise alters only how information on the label is presented, not its content—and so considering braille "a mere trifle is wrong, if not offensive." *Id.* at 20–21. Notably, the FDA disagrees with both assessments: It considers font important enough to require certain statements to be printed in bold-face font and with a minimum size, 21 C.F.R. § 201.57(d); and it determined that Teva's label need not include braille "for the safe and effective use of the product," J.A. at 887. In any event, however, arguments on this score belong in an arbitrary and capricious challenge. *See infra* Section III.C. Plaintiff's views on the relative benefits of printed Roman fonts versus braille lettering are irrelevant to statutory interpretation, and cannot reconcile its inconsistent concession that the different-manufacturer exception permits changing the one but not the other.

Plaintiff's objections to broader readings of the exception are not persuasive. The main one is that any interpretation permitting the approval of Teva's ANDA would have no limiting principles and therefore swallow the statutory same-label requirement. *See, e.g.*, Pl.'s MSJ at 24, Pl.'s Reply at 10–11, 13, 17. That is not true, for several reasons. To begin, there is no dispute that the FDA could not approve generic label changes that made the generic drug unsafe, false, or misleading. *See* 21 U.S.C. § 355(d); 21 C.F.R. § 201.56(a)(2); Pl.'s Reply at 9; Defs.' Reply at 9; Teva's Reply at 5–6. And if an FDA approval erred in one of those respects, it could be challenged on arbitrary and capricious grounds in the ordinary course of judicial review, as Plaintiff has done here. *See infra* Section III.C. In addition, this case concerns only a change to a label's form, not

---

[2] This appears to be a change in Plaintiff's position. In seeking a preliminary injunction, it expressly equated braille lettering with "bold-type or all-caps" printed Roman text that "gives patients important information in a helpful way." Mot. for Prelim. Inj. at 23.

its content—and the form was itself voluntary. Teva's approved label displays in printed Roman text the same information (drug name and dosage) that Plaintiff argues must also be presented in braille. No party has argued that the different-manufacturer exception would permit substantive changes to that information, or the omission of label elements required for the pioneer drug's approval. Given these limits, Teva cannot "merely choos[e] to jettison any safety warnings it desires," and FDA cannot "arrogate to itself sole discretion to decide whether to approve any changes," as Plaintiff protests. Pl.'s Reply at 9–10, 17. More broadly, the same-label requirement will continue to serve its core function of ensuring that generic drugs are as safe and effective as their pioneer counterparts.

Plaintiff also contends that any broader interpretation would ignore or erase statutory language. First, it emphasizes the sameness requirement's tethering to the "labeling *approved* for the [pioneer] drug." Pl.'s MSJ at 24–25 (quoting 21 U.S.C. § 355(j)(2)(A)(v), (j)(4)(G)). But that emphasis leaves open the key question in this case of whether the different-manufacturer exception allows for deviation from that approved label. Second, Plaintiff insists that the word "required" in that exception is superfluous unless its interpretation is adopted. Pl.'s Reply at 14. Not so. As explained above, the word "required" has a range of possible meanings, and in context is best understood in a way that permits the approval of Teva's ANDA here but still substantially constrains the kinds of generic label changes that the FDA may lawfully approve.

Finally, Plaintiff contends that its reading of the different-manufacturer exception is the only one that leaves space for the other exception in § 355(j)(2)(A)(v), which allows a generic manufacturer to file a "suitability petition" seeking authorization to change the "active ingredient," "route of administration, dosage form, or strength" of the drug. Pl.'s Reply at 11 (quoting 21 U.S.C. § 355(j)(4)(G), (j)(2)(C)). That is incorrect. Teva, for example, could not have changed

the active ingredient listed in its proposed label without also making that change in its drug—lest the label be "false or misleading." 21 U.S.C. § 355(d). And it could not change the active ingredient in its drug without filing a suitability petition. *Id.* § 355(j)(2)(C). Consequently, that label change could not be made under the different-manufacturer exception to the sameness requirement, but instead would need to rely on the suitability-petition exception. No part of the FDCA is rendered superfluous.

*       *       *

Interpreting the FDCA requires examining its text, structure, history, and purpose, along with relevant agency and judicial precedent. Here, a holistic reading of the different-manufacturer exception rebuffs Plaintiff's challenge. The exception does not apply "merely because a generic manufacturer would prefer" to change some aspect of the brand-name label. Pl.'s Reply at 23. The FDA must review each proposed generic label and ensure that it is fully compliant with FDCA requirements, including that the generic drug remains safe and effective as labeled, and that its label is not inaccurate or misleading. But neither does the exception absolutely prohibit changes to voluntarily adopted forms of presenting information on the brand-name label where the generic one conveys the same information and the FDA has determined that the change will not diminish the drug's safety or efficacy. Because this case involves such a change, the FDA did not violate the same-label requirement or its different-manufacturer exception in approving Teva's ANDA.

## B.  <u>Same conditions of use requirement</u>

Plaintiff's second basis for claiming that the FDA's actions were contrary to law is the FDCA provision requiring each ANDA to show that "the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for [the pioneer] drug." 21 U.S.C. § 355(j)(2)(A)(i). Plaintiff contends that the printed statement "Dispense in original container" that accompanied the braille lettering on the Hetlioz

label is a condition of use, and that Teva's label unlawfully omitted that statement. Pl.'s MSJ at 30–32.

To understand the term "conditions of use," the court again begins with the plain meaning of the text. In this context, "conditions" most naturally refers to "circumstance[s] that [are] essential to the appearance or occurrence of something else." Webster's Third New Int'l Dictionary 473 (1986). "Use" means "to put into action or service" or "to expend or consume by putting to use," or to "consume or take (as liquor or drugs) regularly." *Id.* at 2523–2524. As a whole, then, the term "conditions of use" denotes the circumstances that are essential to the consumption or taking of the drug. Regulations reflect that meaning, noting in one instance that "conditions of use" encompasses the "method or duration of administration or application" of a drug. 21 C.F.R. § 310.3(h)(5). And the FDA has explained it in even simpler terms: "how, to whom, and for what purpose the drug is administered." J.A. at 890 (citing *ViroPharma, Inc. v. Hamburg*, 916 F. Supp. 2d 76, 80 (D.D.C. 2013)).

The printed label statement "Dispense in original container" is not a condition of use. The statement gives instructions to pharmacies for delivering the drug. It does not provide any direction for the drug's actual "use." It does not explain how Hetlioz should be used, who should use it, or the purposes it serves. Consequently, omitting the statement does not alter any of those features. Unsurprisingly, the statement (and its counterpart "Do not cover Braille") are grouped separately on the Hetlioz label from the language that clearly qualifies as conditions of use, such as "20 mg per day taken before bedtime, at the same time every night," and "Hetlioz should be taken without food." Pl.'s MSJ at 8 (displaying Hetlioz label). Because "Dispense in original container" does not pertain to the drug's use, Teva's omission of that statement did not change any of the conditions of use originally included on the Hetlioz label.

Even if the statement were considered a condition of use, it is not clear that its omission would be unlawful. Section 355(j)(2)(A)(i) requires that all conditions of use included on the generic label be previously approved, but does not necessarily require the converse: that all previously approved conditions of use be included on the generic label. That is the structural reasoning adopted by the D.C. Circuit in *Bristol-Myers*. 91 F.3d at 1500. Because Teva undisputedly did not add anything to the label, therefore, it is difficult to see how it could have failed to show that any additions were previously approved.

In any event, Plaintiff's attempts to characterize the statement "Dispense in original container" as a condition of use are unpersuasive. Plaintiff first seizes on the FDA's description of the statutory term as including "how . . . the drug product is *administered*," Pl.'s MSJ at 15–16 (emphasis added), observing that one definition of "administer" is "dispense," *id.* at 31, and thus concluding that dispensing instructions are conditions of use. But Plaintiff's stacking synonym on synonym departs too far from the language of the statute, which is limited to the drug's "use." 21 U.S.C. § 355(j)(2)(A)(i). The act of a pharmacy dispensing a drug, or of a patient receiving it, does not amount to "use" of that drug in any reasonable sense of the word.

On a different tack, Plaintiff also asserts that "[i]f something on the label helps patients use their drug safely, that is a 'condition of use' for the drug." Pl.'s Reply at 29. Therefore, because the Hetlioz bottle "can be identified by touch," the instruction to "Dispense in original container" assists patients in how they use the drug. *Id.* Again, however, instructions for dispensing a drug are not the same as directions for actually using it, even if the former might have some incidental benefit to the latter. Reading "conditions of use" to mean anything that might affect or relate to conditions of use stretches the statutory text beyond plausibility. The approval of Teva's ANDA did not violate this requirement.

## C. **FDA decision-making**

Finally, Plaintiff argues that the FDA decisions approving Teva's ANDA and denying Plaintiff's citizen petition were arbitrary and capricious for three reasons. First, the FDA "failed to show that it was aware that its interpretation of the same-labeling requirement departed from its former view." Pl.'s MSJ at 32. Second, "it ignored record evidence detracting from its ultimate conclusion." *Id.* And third, it "entirely failed to consider an important aspect of the problem—its approval of another tasimelteon ANDA that included Braille labeling—resulting in FDA treating similarly situated ANDA applicants differently." *Id.* Each of these reasons is fatally flawed.

Plaintiff's contention that the FDA has unlawfully changed its position rests on the FDA's amicus brief in *Mensing*. *See* Br. for the U.S. as Amicus Curiae Supp. Resp'ts, *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) (Nos. 09-993, 09-1039, 09-1501), 2011 WL 741927 ("FDA Br."). In particular, Plaintiff points to the FDA's position "that an ANDA holder may not unilaterally change its approved labeling." Pl.'s MSJ at 33 (quoting FDA Br. at *16). But the FDA does not endorse any such unilateral change here; instead, it acknowledges the statutory limits on permissible changes to generic labels. *See supra* Section III.A. Regardless, there is a broader reason why the FDA Brief does not support Plaintiff's claim. Courts find unexplained changes in agency position arbitrary and capricious only when comparing "factually and legally similar contexts." *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1144 (D.C. Cir. 2014). The *Mensing* case involved only the FDCA's same-label requirement for ANDAs, not the different-manufacturer exception. *See generally* 564 U.S. at 612–13. Indeed, the FDA expressly stated in that case that the exception was "not relevant." FDA Br. at *17. Because *Mensing* did not involve the different-manufacturer exception, it is not a basis for concluding that the FDA's position here treats "similar situations differently." *Fogo De Chao*, 769 F.3d at 1144 (quoting *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995)).

Plaintiff likewise fails to identify evidence that the FDA "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Kempthorne*, 530 F.3d at 997–98 (quoting *State Farm*, 463 U.S. at 43).

To begin, Plaintiff claims that the FDA ignored evidence calling into question the safety of omitting braille on Teva's label, such as an internal comment expressing uncertainty whether "it might be less safe to not have braille on the generic." Pl.'s MSJ at 36 (quoting J.A. at 1, 20). But the administrative record shows that even at the initial stage of approving Teva's ANDA, the FDA expressly considered that comment, as well as alternative internal analysis suggesting that there were no safety concerns, before making its decision. J.A. at 1, 19–20; *see id.* at 915 ("The various views of the individuals were considered by the [FDA] decisionmaker in reaching a decision."); *id.* at 882 n.31 (FDA "consider[ed] the totality of views" expressed in internal comments). By the time the FDA reviewed Plaintiff's citizen petition, moreover, the internal comment expressing concern had been withdrawn, leaving FDA officials unanimous in their opinion that omitting braille would not make Teva's label unsafe. J.A. at 914–15, 919, 927. Additionally, an FDA search of internal records found no reports of medication error or other adverse consequences resulting from the omission of braille from the Teva label more than six months after the drug entered the market. J.A. at 889–90, 907–08. The FDA also relied on findings that "only 10% of the blind population reads braille" and that "other methods to convey labeling information to the larger visually-impaired community" were adequate. J.A. at 888, 927.

Plaintiff insists that these opinions and findings should not outweigh the evidence it submitted when it initially sought approval to include braille on the Hetlioz label and in its citizen

petition.  Pl.'s MSJ at 37.  But it is not the court's place to "substitute its own policy judgment" where the agency has "reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (citations omitted). The FDA explained why it rejected the sole study cited in the citizen petition, for instance, detailing why its methodology was problematic and its relevance to braille for tasimelteon dubious.  J.A. 889, 929–30.  The court's review is "at its most deferential" for the FDA's "scientific determination," "within its area of special expertise," that Teva's label would be safe and effective. *Balt. Gas & Elec.*, 462 U.S. at 103.

Lastly, Plaintiff relies on evidence that was not before the FDA either when it approved Teva's ANDA or when it rejected Plaintiff's citizen petition.  Citing five studies "available online," Plaintiff asserts that this evidence "would have turned up had FDA truly conducted an independent search" for evidence on braille labeling.  Pl.'s Reply at 37.  Similarly, Plaintiff cites a single customer complaint about the omission of braille that it received after the citizen petition was denied.  *Id.* at 35–36.  "But of course, it is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'"  *Hill Dermaceuticals*, 709 F.3d at 47 (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler,* 749 F.2d 788, 792 (D.C. Cir.1984)).  "Exceptions to that rule are quite narrow and rarely invoked."  *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014).  Plaintiff has not invoked any such exception here by contending, for instance, that "the procedural validity of the agency's action remains in serious question," or that "the agency affirmatively excluded relevant evidence."  *Id.* (citations omitted).  Plaintiff's extra-record evidence is therefore not properly before the court.

## IV.   CONCLUSION

For these reasons, the court will DENY Plaintiff's Motion for Summary Judgment, ECF No. 47; GRANT Teva's Cross-Motion for Summary Judgment, ECF No. 48; and GRANT Defendants' Cross-Motion for Summary Judgment, ECF No. 50.  A corresponding Order will accompany this Memorandum Opinion.


Date: February 13, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge